IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SALVADOR BRAVO,

     Petitioner,

  v.                            No. 22-cv-00193 DHU/JFR

ATTORNEY GENERAL for the
STATE OF NEW MEXICO, and OTERO
COUNTY PRISON FACILITY,

     Respondents.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

**THIS MATTER** comes before the Court on Petitioner Salvador Bravo's *Amended Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus By a Person In State Custody*. Doc. 14.  Respondents have filed an Answer, and Petitioner submitted his Reply.  Docs. 31; 37. Petitioner has also filed a response to the Court's Order to Show Cause, Doc. 16, where he sets forth additional argument as to the timeliness of the Amended Petition.  Doc. 19.  Having reviewed the parties' submissions and the relevant law, and for the reasons set forth herein, the Court finds that the Petition is time-barred by operation of 28 U.S.C. § 2244(d)(1), and that Petitioner has not demonstrated actual innocence nor any circumstances warranting equitable tolling of the 1-year limitation period.  The Court therefore recommends against issuing a Certificate of Appealability and that the Petition be **DENIED WITH PREJUDICE**.

---

[1]    The presiding judge referred this matter to the Undersigned by Order of Reference "to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case."  *See* Doc. 22.

## PROCEDURAL BACKGROUND

Petitioner Salvador Bravo was convicted by a New Mexico jury in July 2016 of two counts of criminal sexual penetration of a minor ("CSPM") and one count of contributing to the delinquency of a minor ("CDM").  N.M. Case No D-619-CR-2015-00068; *see* Doc. 31-1 at 25-27 (verdict forms).  The State court sentenced Mr. Bravo to 16 ½ years imprisonment followed by 5 years to life of probation.  Doc. 31-1 at 28-31 (Judgment, Order and Commitment).  On Appeal, the New Mexico Court of Appeals reversed and remanded the judgment, with instructions to the trial court to vacate one count of CSPM and the CDM count.  *Id.* at 169-84 (Memorandum Opinion).  The trial court entered an amended judgment upon remand from the Court of Appeals sentencing Petitioner to 15 years imprisonment.  *Id.* at 273-77 (Amended Judgment).  Petitioner filed a motion to reconsider seeking a reduced sentence, *see id.* at 280-308, which motion the State judge denied on February 5, 2020.  *Id.* at 309-11.

Petitioner filed a habeas petition in the State district court the following year, on January 25, 2021, in which Petitioner advanced the argument that relevant evidence was not disclosed to him, and that lack of disclosure amounted to a Brady violation.[2]  *See* Doc. 31-1 at 322 *et seq.* (Petition for Writ of Habeas Corpus).  The State trial judge denied the petition on May 26, 2021, Doc. 31-2 at 153-78 (Order of Dismissal), and the New Mexico Supreme Court denied the subsequent petition for a writ of certiorari on October 20, 2021.  *See* Doc. 31-5 at 34 (Order Denying Petition).  Petitioner filed his § 2254 petition in this Court on March 16, 2022.  Doc. 1. As the original petition was over 350 pages long, the Court required Petitioner to amend to

---

[2]    Subsequent to the remand from the Court of Appeals and resentencing, Petitioner sought the production of materials that he believed were wrongly withheld from him and/or his attorney during the course of his criminal proceedings.  Petitioner filed various motions in both state and federal courts, included in the record here.  *See* Doc. 31-1 at 211-23 (07/25/2019 Petition to Order the Production of Discovery); *Id.* at 253-57 (09/16/2019 Writ of Mandamus); *Id.* at 259-63 (11/06/2019 Motion to Compel Discovery); *Id.* at 265-72 (12/10/2019 Motion for Sanctions and Criminal Contempt); *Id.* at 314-19 (07/04/2020 Petition for Peremptory Writ of Mandamus).

comply with Rule 8 of the Federal Rules of Civil Procedure.  Doc. 12.  Petitioner did so on

February 6, 2023.  Doc. 14.

## LEGAL STANDARDS

The statutes governing federal habeas corpus actions for state and federal prisoners were

substantially amended by the enactment of the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), effective April 24, 1996.  Pub. L. No. 104–132, 110 Stat. 1214.  The AEDPA

amends 28 U.S.C. § 2244 by imposing a 1-year period of limitation upon the filing of a petition

seeking a writ of habeas corpus by a person in custody pursuant to a state court judgment.  28

U.S.C. § 2244(d)(1).  Petitioner is a New Mexico prisoner seeking federal habeas relief, so his

habeas petition is governed by the AEDPA's amendments.  *See Lindh v. Murphy,* 521 U.S. 320,

336 (1997) (the AEDPA's amendments apply to habeas petitions filed after the AEDPA's

effective date of April 24, 1996); *see also* Doc. 31 at 9 (noting that Petitioner "was in custody at

the time he filed the petitions, and remains in the lawful custody of the New Mexico Department

of Corrections as of the date of the filing of this answer.").

Under 28 U.S.C. § 2244(d)(1)(A), the 1-year limitation period generally begins to run

from "the date on which the judgment became final by the conclusion of direct review or the

expiration of the time for seeking such review."  The 1-year limitation period is tolled for "[t]he

time during which a properly filed application for State post-conviction relief or other collateral

review with respect to the pertinent judgment or claim is pending . . . ."  28 U.S.C. § 2244(d)(2).

Additionally, the 1-year limitation period may in rare and extraordinary circumstances "be

subject to equitable tolling."  *Miller v. Marr,* 141 F.3d 976, 978 (10th Cir.), *cert. denied,* 525 U.S.

891 (1998).

Section 2244(d)(1) states:

A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."

28 U.S.C. § 2244(d)(1)(D).  Thus, under the statute, a judgment becomes "final" in one of two ways—either by the conclusion of direct review by the highest court, including the United States Supreme Court, or by the expiration of the time to seek such review, again from the highest court from which such direct review could be sought.  *Locke v. Saffle*, 237 F.3d 1269, 1272-73 (10th Cir. 2001); *see also Bowen v. Roe,* 188 F.3d 1157, 1158-59 (9th Cir. 1999) ("We hold that the period of 'direct review' in 28 U.S.C. § 2244(d)(1)(A) includes the period within which a petitioner can file a petition for a writ of certiorari from the United States Supreme Court, whether or not the petitioner actually files such a petition."); *Smith v. Bowersox,* 159 F.3d 345, 348 (8th Cir. 1998), *cert. denied,* 525 U.S. 1187 (1999) ("[T]he running of the statute of limitations imposed by § 2244(d)(1)(A) is triggered by either (i) the conclusion of all direct criminal appeals in the state system, followed by either the completion or denial of certiorari proceedings before the United States Supreme Court; or (ii) if certiorari was not sought, then by

the conclusion of all direct criminal appeals in the state system followed by the expiration of the time allotted for filing a petition for the writ.").[3]

A federal habeas petitioner may set forth an actual innocence claim, which is an exception to the AEDPA's 1-year period of limitation. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). The actual innocence gateway, however, is a narrow exception that "applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *Id.* at 395 (*quoting Schlup v. Delo*, 513 U.S. 298, 329 (1995)). "[A] credible showing of actual innocence will allow [a petitioner] to overcome . . . his failure to abide by the federal statute of limitations in order to have his [constitutional] claim[s] heard on the merits." *Fontenot v. Crow*, 4 F.4th 982, 1030 (10th Cir. 2021). Such a showing requires the petitioner to demonstrate that "in light of new evidence, it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Id.* (internal quotations omitted). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). Impeachment evidence "is [not] persuasive evidence of 'actual innocence.'" *Stafford v. Saffle*, 34 F.3d 1557, 1562 (10th Cir. 1994). Rather, a district court must make a "probabilistic determination about what reasonable, properly instructed jurors would do." *Schlup*, 513 U.S. at 329. Only if the

---

[3]    When faced with the question of when direct review by state courts is final, federal courts are in agreement that a state conviction becomes final, for purposes of determining the accrual date for AEDPA's 1-year limitations deadline, 90 days after discretionary review by the highest state court is concluded. *See, e.g., Locke*, 237 F.3d at 1273; *Beery v. Ault*, 312 F.3d 948, 950 (8th Cir. 2002); *Wixom v. Washington*, 264 F.3d 894, 897 (9th Cir. 2001); *Bronaugh v. Ohio*, 235 F.3d 280, 283 (6th Cir. 2000); *Valverde v. Stinson*, 224 F.3d 129, 132 (2nd Cir. 2000); *Flanagan v. Johnson*, 154 F.3d 196, 197 (5th Cir. 1998); *Bowen v. Roe*, 188 F.3d 1157, 1159 (9th Cir. 1999). The Tenth Circuit has further stated that the period of limitations is tolled when a state post-conviction review is "pending," holding that "regardless of whether a petitioner actually appeals a denial of a post-conviction application, the limitations period is tolled during the period in which the petitioner *could have* sought an appeal under state law." *Gibson v. Klinger*, 232 F.3d 799, 804 (10th Cir. 2000) (emphasis in original).

district court concludes that no juror, acting reasonably, would have voted to find petitioner

guilty, does actual innocence serve as a gateway to federal habeas relief. *Id.*

Finally, the AEDPA's 1-year limitations period may also be subject to equitable tolling

which is "limited to rare and exceptional circumstances." *Laurson v. Leyba*, 507 F.3d 1230,

1232 (10th Cir. 2007) (citation and internal quotation marks omitted).  To be entitled to this

doctrine's protections, the petitioner must show that (1) he has been pursuing his rights

diligently, and (2) some extraordinary circumstance beyond his ability to control stood in the

way and prevented timely filing. *Holland v. Florida,* 560 U.S. 631, 649–650 (2010); *Pace v.*

*DiGuglielmo,* 544 U.S. 408, 418 (2005); *Marsh v. Soares*, 223 F.3d 1217, 1220 (10th Cir. 2000).

Petitioner has the burden of showing that he was prevented in some extraordinary way from

asserting his rights and that he acted diligently. *Urcinoli v. Cathel*, 546 F.3d 269, 273 (3rd Cir.

2008) (citations omitted).  A failure to exercise reasonable diligence after the extraordinary

circumstance began breaks the causal relationship between the circumstance and the untimely

filing. *Brown v. Shannon,* 322 F.3d 768, 773 (3rd Cir. 2003) (quoting *Valverde v. Stinson,* 224

F.3d 129, 134 (2nd Cir. 2000)).  Equitable tolling is appropriate only in extraordinary situations,

and the petitioner bears the burden of demonstrating its appropriateness. *See Miller v. Marr,* 141

F.3d 976, 978 (10th Cir. 1998).

## **ANALYSIS**

After reviewing the motion and response, as well as the underlying files and records[4] of

the case, the court can hold an evidentiary hearing.  28 U.S.C. § 2254; *Townshend v. Sam*, 372

---

[4]    Among the extensive records in this case is a CD of the July 26-27, 2016 jury trial in the underlying State court criminal trial.  Respondent lodged this CD with the Clerk of the Court as part of its response.  Doc. 32.  The Court notes that the jury trial CD contains 19 audio files of varying length, each of which has its own running time stamp. Using as an example the file "DEMD CR 1_20160726-0902_01d1e71c62e91cc0.mp3", the Court will cite to the audio recordings with reference to the file date (July 26, 2016) and file start time (-0902), and include a pinpoint timestamp, e.g. "Jury Tr. July 26, 2016, File -0902 at 19:52".

U.S. 293, 312 (1963).  To warrant such a hearing, a petitioner must show that the hearing held in

state court was not fair or adequate.  Rules Governing Section 2254 Cases, Rule 8 Adv. Comm.

Notes; § 2254(d).  When reviewing the record in this case, including the parties' briefing and all

documents in the underlying criminal case, the Court is mindful that it must liberally construe a

pro se litigant's pleadings and hold them to a less stringent standard than pleadings drafted by an

attorney.  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citations omitted).  The Court

has done so here and has determined that no such evidentiary hearing is warranted, as the

Petition, files and records in this matter conclusively show that Petitioner received a fair and

adequate hearing.  The Court is comfortable ruling without taking additional testimony or

evidence.

    1. <u>Because Petitioner Concedes That He Failed To Meet Section 2244(d)(1)(A)'s 1-Year Limitation Period, Petitioner Is Only Entitled To Relief Either By Passing Through The Actual Innocence Gateway Or By Demonstrating That He Is Eligible For Equitable Tolling</u>

Petitioner's convictions became final after the passage of the AEDPA, so the AEDPA

governs the instant petition.  Hence, barring any tolling, Petitioner had one year after the

conclusion of direct review of his convictions to file a federal habeas petition.  *See* 28 U.S.C. §§

2244(d)(1)(A), (d)(2).  In this case, Petitioner concedes that he didn't file his federal petition

within one year after his state court conviction became final.  *See* Doc. 19 at 33 (acknowledging

"… untimely filing his first federal habeas petition after the expiration of AEDPA's statute of

limitations…").  Previously, the Court concluded the 1-year limitation period had run in this

matter, *see* Doc. 16 at 4 (noting that the § 2254 petition was filed 105 days after the expiration of

the 1-year limitation period), and Petitioner's response to the Court's Order to Show Cause

lodges no exception to this finding.  As such, absent actual innocence or equitable tolling,

Petitioner's § 2254 petition is time-barred.

A.  The Actual Innocence Gateway is Not Available to Petitioner

Petitioner's claim to actual innocence centers on evidentiary items that were allegedly withheld from him and his attorney prior to trial, were not introduced into evidence or only partially introduced at trial, but if discovered pre-trial would have enabled Petitioner to prove that he was actually innocent.  These items are: (1) the complete "Sexual Assault Nurse Examiner" (SANE) report; (2) a DNA laboratory report; (3) a transcript or recording of the victim's Safehouse interview; and (4) case materials from a separate state district court matter that purportedly affects the credibility of key state witnesses.  Petitioner first obtained these materials, or claims he became aware of their existence, on November 12, 2019.  Doc. 19 at 4 ("…Petitioner first discovered the evidence on November 12, 2019…"); *see also id.* at 6 (re SANE report); at 9 (re DNA report); at 12 (re Safehouse interview); at 16 (re credibility evidence).

The actual innocence gateway provides relief only if Petitioner can demonstrate that the jury acting reasonably would not have convicted had it been aware of the missing material.  This narrow exception "applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *Fontenot,* 4 F.4th at 1030.  Thus, to determine whether the actual innocence gateway is available here, the Court must analyze whether, if presented with the "new" evidence, no juror acting reasonably would have voted to find Petitioner guilty.[5]  Accordingly, a review of the evidentiary value of the missing/disputed materials follows.

---

[5]    Respondent does not dispute Petitioner's claim that the items in dispute were not produced pre-trial to Petitioner and/or his trial counsel; for purposes of its analysis, the Court therefore accepts Petitioner's claim that they had not been produced in pre-trial discovery and will consider the evidentiary items "new".

SANE REPORT:  Petitioner argues that the SANE report is crucial because it documents an examination of the victim conducted just hours after the alleged sexual assault, is material to guilt or innocence, could have been used as impeachment evidence, and tends to be exculpatory because it demonstrates that no forced or coerced sexual penetration occurred.  Doc. 19 at 5-8.  Petitioner notes that the SANE report found no injuries on the victim.  *Id.* at 8.  Petitioner argues that, by not having the full SANE report to consider, the jury was unable to compare and contrast statements made in the SANE report with those made by the victim at trial, "to fully evaluate [the victim's] credibility."  Doc. 31-1 at 379.  Petitioner argues the ability to challenge the credibility of the victim was crucial given that the evidence of guilt was not overwhelming, and forensic evidence that was inculpatory in nature was lacking.  *Id*.

The SANE report is a 17-page document that was completed the same day the victim reported the sexual assault.  Doc. 31-1 at 453-469 (SANE report).  The report reveals that the victim identified the Petitioner as the assailant, and that he used force by grabbing her arms and legs.  *Id*. at 457.  The examiner wrote two pages of notes from the interview, and included numerous quotations from the victim as to the details of the assault.  The victim related how Petitioner approached her early in the morning while she was asleep on the couch, laid her on the ground, removed her clothes and despite her protestations penetrated her first digitally and then with his penis.  *Id*. at 458.  The victim told the examiner that she was unable to get free until Petitioner's girlfriend came into the room.  *Id*. at 459.  The victim related that after she got home she took a shower and got cleaned up, and proceeded to tell her parents what had happened.  *Id*.  The SANE examiner also checked off various boxes, including "yes" to whether the offender kissed, licked and bit the victim.  *Id*. at 460.  Various bruises on the victim's arms and legs were

noted, as was sharp pain in her vaginal area.  *Id*. at 460-61.  But as Petitioner points out, no injuries were noted to the victim's vagina.  *Id.* at 465.

At Petitioner's trial, the State introduced into evidence a single page diagram from the 17-page SANE report.  Petitioner claims that the prosecution had not disclosed the full report to his lawyer prior to trial, a fact which Respondent fails to contest.  In State habeas proceedings, the State judge reviewed the full report for its impeachment value, but noted that Petitioner, beyond simply referring to the SANE report itself, failed to demonstrate how the full report was exculpatory.  Doc. 31-2 at 169-70.  The judge noted that the SANE report indicates that the victim did not sustain vaginal injuries, that her hymen was normal, that bruises were noted on the victim's arms and legs, and that the victim reported that the defendant had bitten her on the back.  *Id*.  And yet at trial, defense counsel highlighted these findings to the jury, and even prompted the victim to deny that she told the SANE nurse that she had been bitten even though the report says otherwise.  *See* Jury Tr. July 26, 2016, File -1329-02 at 16:30 (victim denied having been bitten, licked or kissed).  The State trial judge concluded that the SANE report's relevant impeachment evidence was indeed utilized by defense counsel in cross-examination and thereby was presented to the jury, even if the full report had not been provided to the defense prior to trial.  Doc. 31-2 at 170.

The State trial judge concluded that the prosecution's failure to disclosure the full SANE report to the defense prior to trial was not material to the outcome of the case.  *Id*.  Based on its independent review of the case, including reviewing the 17 page report and listening to the jury trial in its entirety, the Court agrees.  The Court finds that the main features of the SANE report were discussed by the report's author at trial, and that defense counsel cross-examined the witness with the report's contents.  In front of the jury, the witness admitted she did not see any

injuries in or near the victim's vagina, that she had no idea how the bruising on the victim's arms

and legs occurred or when, that there was no sign of bite marks as mentioned by the victim, and

that the witness did not interview anyone else related to the case or travel to the crime scene.  *See*

Doc. 31-2 at 50-52; *see also* Jury Tr. July 27, 2016, File -0905 at 28:25 et seq.

Based on its meticulous review of the record in this case and employing its "probabilistic

determination", *see Schlup*, 513 U.S. at 329, the Court concludes that Petitioner fails to show any

prejudice based on the State's failure to disclose the full SANE report in discovery prior to trial.

Timely pre-trial disclosure of the full report would not have resulted in any reasonable juror

voting to acquit; indeed, defense counsel utilized salient features of the report to impeach the

witness.  *Id.*  The Court agrees with the State trial judge and finds Petitioner's actual-innocence

argument with respect to the SANE report unpersuasive.

SAFEHOUSE INTERVIEW:  Petitioner next argues that his actual innocence would

have been established but for the State's failure to disclose the victim's Safehouse interview to

the defense prior to trial, as it contained exculpatory evidence.  Doc. 31-1 at 372 (arguing

Safehouse interview "contained a wealth of inconsistent statements which were crucial for

impeachment…").  Petitioner presented this argument to the State trial judge in habeas corpus,

which argument was summarily rejected.  Doc. 31-2 at 170-71.  Petitioner argued that in her

Safehouse interview, the victim stated that Petitioner's then-girlfriend came into the room when

Petitioner tried to "cuddle" her, which apparently contradicts the victim's trial testimony that the

penetration stopped *because* the girlfriend came into the room.[6]  Doc. 31-1 at 373.  The State

judge found the inconsistency not significant enough to make the interview exculpatory, because

---

[6]     For his part, Petitioner offered a third version, testifying at trial that that he was woken up by the victim
unzipping his pants, which is precisely the moment when his girlfriend walked into the room.  Jury Tr. July 27,
2016, File -1331 at 21:50 to 23:20.

11

the victim still claimed in the Safehouse interview that she had been penetrated by Petitioner. Doc. 31-2 at 170.  The State judge also rejected Petitioner's claim that the Safehouse interview revealed that the victim fabricated the story against him because she was being physically abused by her father; the judge concluded nothing in the interview supports this claim, and the interview does not constitute damaging impeachment evidence as Petitioner argued.  *Id*. at 171. "Therefore, the balance of Petitioner's trial would not have tipped in any meaningful way if the prosecution had provided the safe house interview sooner." *Id*.

The Court's independent review of the Safehouse interview similarly finds that timely, pretrial disclosure of the interview would not have altered the jury's verdict.  The transcript of the interview[7] reflects that the victim clearly told the detective that Petitioner vaginally penetrated her with his fingers and penis; the transcript of these disclosures shows that the answers were given in narrative form and not in response to leading questions.  *See* Doc. 31-2 at 98.  The victim stated that she was held down, repeatedly stated no, but that Petitioner continued to sexually assault her.  *Id*.  The interview also contained information that could be seen as grooming behavior by the Petitioner, in that the victim stated that Petitioner had acted inappropriately with her in the weeks and months leading up to the assault.  *See id*. at 101 ("And so then that's how it all started.  And then, like later on, a couple times when I'm there, like, there were times where I was sleeping with Andrea and he would try to take me out of the room…").  *Id*. at 101; *see also id*. at 103 (discussing other incidents where Petitioner would tell victim that he loved her, that he wants to be with her, that he'll wait for her until she's old

---

[7]    The Safehouse interview is described by the State judge as the interview of the victim that was conducted by Detective Rudiger.  Doc. 31-2 at 170.  The record appears to contain only a portion of the transcribed interview.  *See* Doc. 31-2 at 98-103; Doc. 31-4 at 198-203.

enough so they could be married).  The victim also related that Petitioner's girlfriend "was

logging her suspicions" about Petitioner's inappropriate behavior.  *Id*. at 102.

The Court finds that timely disclosure of the Safehouse interview, and use of it during

trial to impeach the victim or other witness, would clearly not have altered the jury's verdict.

Regarding Petitioner's claim that the Safehouse interview contains a "wealth" of inconsistent

statements which could have been used to attack the victim's credibility, the Court's independent

review of the interview finds otherwise.  The Court concludes that the Safehouse interview does

nothing to advance the argument that Petitioner is actually innocent, and that had it been

disclosed and utilized during trial, no reasonable juror would have voted for acquittal.

DNA REPORT:  Next, Petitioner claims that his actual innocence is demonstrated

through the DNA laboratory report that was generated in the investigation but not disclosed to

the defense prior to trial; Petitioner argues that, had his attorney been able to use the DNA report

at trial, the jury would not have voted to convict.  Petitioner describes the DNA report as

"critical" and "material under *Brady*", Doc. 19 at 12, but doesn't explain how the report was

either.  Petitioner claims that the State's expert witness testified to the report's contents and

claims that the results were "inconclusive".  "However, for an expert to just mention DNA

evidence to a jury, especially in a sexual assault case, regardless of its 'inconclusive' results or

not, was enough to prejudice the jury in and of itself." *Id.* at 10.  Petitioner continues: "[e]ven

more damaging… was that the jury also heard the State's expert testify that 'human male DNA

was identified on item 3B…'". *Id.*  "Because of the withholding of evidence and IAC combined,

Petitioner's attorney never had the opportunity to investigate, cross-examine, or impeach the

state's expert with her own report." *Id.*  Had the report been disclosed, argues Petitioner, defense

counsel would have obtained a rebuttal expert. *Id.*  Finally, Petitioner emphasizes that "because

this case was relatively weak and based primarily on credibility", the DNA report with its inconclusive results could have been used as impeachment evidence that would have helped the defense.[8]  *Id.* at 12.

The record contains a 2-page "Laboratory Report", i.e. DNA Report, dated October 9, 2015, that documents the scientific analysis of swabs taken from the victim during her SANE examination and of a separate swab that was taken from Petitioner for comparison.  The analyst who performed serology, standard DNA, and male Y-STR testing on the swabs, noted the following results and conclusions in her report:

> **DNA RESULTS AND CONCLUSIONS:**
> Human male DNA was detected on items 3A and 3E; however, not in sufficient quantity for further DNA testing;
> Human male DNA was identified on item 3B; however, not in sufficient quantity for conventional STR DNA testing;
> No human male DNA was detected on items 3C, 3D, 3F, 3G, 3H, 3I, 3J, 3K or 3M.
> No human DNA was detected on item 3L.
> **MALE Y-STR RESULTS AND CONCLUSIONS:**
> Samples from 3B and 9 were tested using the Applied Biosystems AmpF9STR T-filer PCR Amplification Kit.
> No male Y-STR DNA profile was obtained from item 3B.

*See* Doc. 31-1 at 535-36 (DNA Report).[9]

---

[8]    The Court notes that the record includes a printout of an email sent from a criminal investigator—presumably hired by defense counsel—to Petitioner's trial counsel, on June 22, 2016, or in the weeks leading up to trial.  *See* Doc. 31-1 at 593.  The investigator reports to counsel that he had "received lab reports of DNA testing and there is nothing to connect Salvador Bravo to this young lady other than there was 'Human DNA' detected on swabs 3A and 3E…"  *Id.*  The email notes that the male DNA that was detected could not be tested based on insufficient quantity, but warns that the State would likely argue that Petitioner was the source of the male DNA as such is consistent with the victim's claims that he touched the victim.  *Id.*  The investigator advises that it would be helpful to show that the victim had "a boyfriend or two" who could have been the source of this male DNA.  *Id.*

Thus, Petitioner's claim that "the DNA report… was initially presented to the State Court after it was disclosed on November 12, 2019" is not entirely accurate.  *See* Doc. 19 at 9.  The record documents that Petitioner's trial counsel was apprised of the report in June 2016, about a month before trial, and said report was evaluated by counsel's investigator working on behalf of Petitioner.  The record therefore establishes that defense counsel had access to this material prior to trial.  Nonetheless, because Respondent here does not dispute that the material had not been disclosed to Petitioner until November 2019, the Court considers the DNA report as "new" evidence for purpose of its actual innocence analysis.

[9]    The DNA analyst examined the following items: 3A (Vaginal Swabs); 3B (Cervical swabs); 3C (Anal swabs); 3D (Oral swabs); 3E (Mons pubis/outer labia majora swabs); 3F (Swabs from fossa navicularis, posterior fourchette and perineum); 3G (Swabs from labia minora, clitoral hood and hymen); 3H (Lower back swabs); 3I (Neck swabs);

At trial, the analyst who performed the DNA testing testified as an expert witness in DNA serology.  *See* Doc. 31-2 at 52-53.  The expert tested two pieces of evidence—a sexual assault kit on the victim, and a DNA sample from the Petitioner.  *See* Jury Tr. July 27, 2016 File -0947 at 08:40 et seq.  The expert noted for the jury that the victim had apparently bathed, ate and brushed her teeth prior to the test.  *Id.* at 11:35 et seq.  From the 14 swabs, the expert testified that human DNA was detected but not in sufficient quantities to do further testing; the expert couldn't make a determination if there was male DNA on the swabs taken from the victim, and therefore couldn't rule in or out whether the Petitioner's DNA was present.  *Id.* at 20:23 et seq.; Doc. 31-2 at 53.  The expert stated that, given the fact that the victim had bathed, this wasn't surprising.  Jury Tr. July 27, 2016 File-0947 at 23:50.  On cross-examination, defense counsel generally highlighted that the expert was unable to make the determination of whose male DNA was present.  *Id.* at 25:10.

Petitioner claims prejudice because, despite the State's expert being unable to conclude that Petitioner was the source of the male DNA located on the victim's swabs, the jury was left with the inescapable conclusion that it had to be Petitioner's DNA.  Petitioner suggests that the jury was improperly influenced by the scientific evidence, notwithstanding its inconclusive nature, given the fact that the witness was an expert.  "However, for an expert to just mention DNA evidence to a jury, especially in a sexual assault case, regardless of its 'inconclusive' results or not, was enough to prejudice the jury in and or itself."  Doc. 19 at 10.

---

3J (Swab from left outer leg/knee bruises); 3K (Right outer leg swab); 3L (Swab from right inner lower arm); 3M (Swab from left arm bruises); 3N (DNA standard); 9 (Salvador Bravo DNA standard).

Like the trial judge in State habeas proceedings,[10] the Court is not persuaded.  The expert witness clearly stated her results were inconclusive and that she was unable to identify the Petitioner as the source.  Furthermore, the Petitioner fails to explain just what in the full DNA report would have been used to Petitioner's advantage, had counsel chosen to make use of it at trial.  Petitioner claims that counsel may have retained an opposing expert witness, but doesn't explain what a defense witness would have been able to do other than affirm the inconclusive nature of the results.  Given the lack of detail as to how the full and allegedly undisclosed DNA report was "exculpatory" or how defense counsel would have taken advantage of said full report, and given that the State's case revolved around the victim's testimony and her credibility, the Court is left to speculate how the DNA somehow advances Petitioner's actual innocence argument.  The Court concludes that the DNA report, either alone or in combination with the other items, does nothing to open the actual innocence gateway to Petitioner.

CREDIBILITY MATERIALS:  Finally, Petitioner claims that the State's failure to disclose evidence of a separate domestic violence/stalking case denied to the defense exculpatory evidence which would have caused the jury to acquit.  Prior to trial, the victim's father sought in

---

[10]   In its Order Dismissing Petition for Writ of Habeas Corpus, the trial judge reviewed Petitioner's claims regarding the DNA report and found the following:

54. Petitioner claims that the prosecution's failure to disclose the DNA Crime Lab report was an act of prosecutorial misconduct.  However, the report was not material to Petitioner's conviction.  The DNA report states that the results were inconclusive, and the prosecution did not rely on it, focusing the case on the testimony of the victim.  Therefore, earlier disclosure would not have affected the outcome of the trial.

55. Petitioner also claims that the omission of the DNA report was prejudicial as it denied him the opportunity to challenge the results through an expert.  He argues that the DNA evidence would have been reliable and exculpatory if the PCR method of DNA analysis had been used.  However, the forensic laboratory *did* use the PCR method: the DNA report states that "Samples from item 3B and 9 were tested using the Applied Biosystems AmpF/STR Y-filer PCR Amplification Kit." Pet. for Writ of Habeas Corpus, 215.

*See* Doc. 31-2 at 169 (italics in original).

State court an Emergency Order of Protection, based upon allegations that Petitioner had made

unwanted contact with the victim in violation of his conditions of release in the underlying

criminal prosecution.  *See* Doc. 31-1 at 559-583.  The State judge issued a Temporary Order of

Protection, but after an evidentiary hearing refused to make the order permanent based on a

failure of proof.  *See* Doc. 31-1 at 581-83 (Order Dismissing Petitioner and Terminating

Temporary Order of Protection).

Petitioner now claims that the prosecution in his criminal case should have produced in

discovery the case materials from the civil matter, and that by not doing so the State denied

Petitioner exculpatory materials, further entitling him to argue actual innocence.  The Court fails

to see how said materials are exculpatory, as they have no bearing on the underlying criminal

charges and are therefore not material or relevant to the criminal case.  The fact that the

temporary order was dismissed and not made permanent is not exculpatory to Petitioner, as the

determinative issues in that civil proceeding have little to no relation to the matters in the

criminal case; that Petitioner was not shown to have violated his conditions of release (by

allegedly stalking the victim) does nothing to suggest he is any more or less likely to have

committed the underlying criminal charges.  *Cf. United States v. Arledge*, 220 Fed.Appx. 864,

867 (10th Cir. 2007) (Unpubl.) (acquittal on underlying state criminal charges that formed the

basis of a permanent protective order not relevant to separate federal charges); *see also Johnson

v. Yelich,* 2013 WL 5592735, *7 (N.D.N.Y. Oct. 10, 2013) ("That the protection order and

complaint were later dismissed does not alter the fact that the jury determined beyond a

reasonable doubt that Johnson committed the offenses of which he was convicted.").

Additionally, the documents' impeachment value is minor at best.  The Court also notes that, as a

party to the civil case, Petitioner himself had access to the documents and could have directed his

counsel to obtain copies and attempt to utilize them in his criminal case.  Using its "probabilistic determination" about how the credibility materials would have influenced reasonable, properly instructed jurors, the Court concludes that such jurors would have been unmoved.

In sum, then, the items relied upon by Petitioner (i.e. SANE report, Safehouse interview, DNA report, credibility materials) do little to advance a claim of actual innocence.  After close review, the Court is unable to conclude that "in light of new evidence, it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Fontenot*, 4 F.4th at 1030.  There is nothing about these items that points to factual innocence, and they represent little more than impeachment evidence at best.  Because Petitioner fails to make a credible showing of actual innocence based on new evidence, the Court recommends that the District Judge deny the actual innocence exception to Petitioner's time-barred claims.

B.  Petitioner Is Not Entitled To Equitable Tolling

Equitable tolling is "a remedy suitable only in extraordinary circumstances." *Clark v. Oklahoma,* 468 F.3d 711, 714 (10th Cir. 2006).  Assuming the AEDPA's 1-year limitation period is subject to equitable tolling[11], it is only available when an inmate diligently pursues his claims and demonstrates that the failure to timely file was caused by extraordinary circumstances beyond his control. *Marsh,* 223 F.3d at 1220; *Burger v. Scott,* 317 F.3d 1133, 1141 (10th Cir. 2003).  Here, Petitioner claims that the record demonstrates that he exercised diligence in filing his federal habeas claim, but various impediments stood in his way.  Doc. 19 at 34-44. Specifically, Petitioner contends that (1) the withholding of *Brady* evidence by the prosecution, and (2) the COVID-19 pandemic that resulted in the prison's lockdown, prevented timely filing.

---

[11]   The Supreme Court has not explicitly decided if equitable tolling applies to § 2254's limitation period, *see Lawrence v. Florida,* 549 U.S. 327, 336 (2007), but has stated that if it would apply, the petitioner "must show (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Id.* at 336 (internal quotation marks and citation omitted).

*Id.* at 35-36; *see also* Case 2:20-cv-00666-RB-KK, Doc. 1 (Petition for Peremptory Writ of Mandamus) (outlining efforts made to obtain discovery materials).

Neither of these circumstances justifies equitably tolling the AEDPA 1-year period of limitation, but even if they did, they can't justify the more-than three months that it took Petitioner to file his § 2254 Petition after the limitations period ran.  *See* Doc. 16 at 3-4 (explaining that 1-year limitations period had lapsed).  First, the record demonstrates that the material in dispute had been disclosed to Petitioner.  In his State habeas petition, Petitioner attaches a November 12, 2019 letter from the Sixth Judicial District Attorney's Office listing discovery disclosed to him in response to a Motion to Compel Discovery.  Doc. 31-2 at 97.  Among the discovery items produced to Petitioner on that date were a laboratory report, documents relating to a Petition for Order of Protection, SANE report, and DVDs and CDs including the forensic interview of the victim.  *Id.*  Thus, the record reflects Petitioner had in fact acquired <u>all</u> the items that he now claims he lacked in November 2019, well prior to the expiration of the 1-year limitation period to file his federal habeas petition.  Petitioner offers no convincing explanation as to why he was unable to file his § 2254 petition within the 1-year limitation period, or by December 2, 2021.  *See* Doc. 16 at 4.

Petitioner points to the COVID-19 pandemic as grounds for equitably tolling the AEDPA's 1-year limitation period.  Petitioner argues that the pandemic prompted a prison lockdown which then restricted his access to legal research and the ability to obtain and/or review his legal files.  *See* Doc. 19 at 39.  Nonetheless, Petitioner doesn't explain how these obstacles prevented him from communicating with this Court to describe his predicament, seek an extension or otherwise reasonably attempt to meet his deadline.  *See Holland v. Florida*, 560 U.S. 631, 653 (2010) ("The diligence required for equitable tolling purposes is " 'reasonable

diligence,' […] not maximum feasible diligence…") (internal quotation marks and citations

omitted).  Diligence to meet a filing deadline requires some effort, and yet the efforts engaged in

by Petitioner had little to do with surmounting any obstacles to timely filing.  "Actively pursuing

judicial remedies" in state courts, or even seeking mandamus separately in federal court as

Petitioner did here, concern Petitioner's efforts to obtain discovery.  As such, the time spent

pursuing this material does not equitably stop the AEDPA 1-year clock from running.  *See*

*Levering v. Dowling*, 721 Fed.Appx. 783, 787-88 (10th Cir. 2018) (Unpubl.) (prisoner must

diligently pursue his federal habeas claims; time spent conducting legal research, filing motions

for transcripts and exhibits in state court, or filing deficient application for post-conviction relief

with state court does not constitute diligence).  Because Petitioner's prolonged campaign did

nothing to advance his federal claims, Petitioner can not establish reasonable diligence.[12]

Numerous cases tend to support the Court's conclusion.  In *Marsh v Soares*, the petitioner

claimed "his ignorance of the law completely robs him of any opportunity to fend for himself or

otherwise gain equal access to the courts," a claim quickly rejected by the Tenth Circuit, as the

appellate court noted that ignorance of the law, "even for an incarcerated pro se petitioner,

generally does not excuse prompt filing."  223 F.3d at 1220 (internal quotation marks and

citation omitted).  Reliance on an inmate law clerk does not relieve the petitioner from the

personal responsibility of complying with the law, *id.,* and a 15-day closure of the prison law

library, even if considered "extraordinary," does not justify the delay in filing.  *Id.* at 1221; *see*

*also Miller,* 141 F.3d at 978 (the AEDPA's 1-year limitation period does not constitutionally

---

[12]    Indeed, Petitioner waited more than 14-months to file his State habeas petition after receiving the disputed
materials, a delay that undercuts Petitioner's assertion that he acted with sufficient diligence.  *See McQuiggin*, 569
U.S. at 388-89 ("If the petition alleges newly discovered evidence… the filing deadline is one year from 'the date on
which the factual predicate of the claim or claims presented could have been discovered through the exercise of due
diligence.'") (citing 28 U.S.C. § 2244(d)(1)(D)).

infringe an inmate's access to the Great Writ, even when the inmate lacked access to certain

legal materials). Similarly, an inmate's lack of legal assistance is unavailing to toll the 1-year

limitation period of § 2244(d) as there is no right to legal assistance when pursuing a habeas

action unless the Court determines an evidentiary hearing is needed. *Swazo v. Wyoming Dept. of*

*Corr.,* 23 F.3d 332, 333 (10th Cir. 1994). And even when an inmate is represented by counsel, an

attorney's miscalculation of the limitation period has been held not sufficient to warrant

equitable tolling. *Lawrence v. Florida*, 549 U.S. 327, 336-37 (2007). *See also Miller v. Marr*,

141 F.3d 976, 978 (10th Cir. 1998) (diligence is not met where Petitioner waited more than a year

before the extraordinary circumstance being argued as justification for the equitable tolling was

created); *Cooperage v. McKune*, 524 F.3d 1279, 1282 (10th Cir. 2008) (petitioner denied

equitable tolling for lack of diligence where he failed to file his petition within the 50 days

remaining in the limitation period after he received notice that his state petition had been denied).

These cases strongly suggest that Petitioner here cannot rely on lack of discovery or other legal

materials, COVID-19 restrictions, unresponsive attorneys or otherwise, to justify tolling the 1-

year limitation period of the AEDPA.

The Court has previously found that the AEDPA 1-year limitation period expired no later

than December 2, 2021. Doc. 16 at 4. Petitioner does not dispute this finding, nor that he filed

his federal petition some 105-days later. In the final analysis, Petitioner has failed to allege with

specificity the steps that he took to diligently pursue his federal claims. Nor has he sufficiently

established that the grounds he alleges—withholding of *Brady* material, COVID-19 pandemic—

actually resulted in the untimely filing. *Marsh*, 223 F.3d at 1220 ("this equitable remedy is only

available when an inmate diligently pursues his claims and demonstrates that the failure to timely

file was caused by extraordinary circumstances beyond his control.") (citations omitted). The

Court concludes that a delay of over three months in filing the instant Petition in federal court demonstrates a lack of reasonable diligence that precludes equitable tolling. As such, the AEDPA requires dismissal of the Petition.

      C. <u>Statutory Tolling Does Not Apply</u>

      Petitioner also argues that "statutory tolling" excuses his otherwise late filing. *See* Doc. 14 at 18; Doc. 19 at 44-46. Specifically, by his calculations, Petitioner claims that "he is entitled to at least seventy (70) days of statutory tolling". Doc. 19 at 47. Petitioner argues that, after the State district judge issued the amended judgment on December 28, 2019, *see* Doc. 31-1 at 273-77, he filed a motion for reduction of sentence, on January 13, 2020. *Id*. at 280 et seq. This motion was denied on February 5, 2020, which prompted Petitioner to file a notice of appeal. While the record demonstrates that Petitioner filed his appeal on March 9, 2020, *id.* at 312-13, Petitioner claims that he mailed the notice on March 4, 2020, and by operation of the prison mailbox rule, the filing is timely, on March 4, 2020. Doc. 19 at 45-46. Petitioner did not pursue this appeal, however, as he chose to not file a docketing statement. *Id.* at 46. Nonetheless, Petitioner claims that AEDPA's 1-year limitation period, which would have begun to run on March 7, 2020 (consistent with the Court's prior finding, *see* Doc. 16 at 2), was statutorily tolled for "for an additional thirty (30) days, until April 3, 2020, while the notice of appeal remained 'pending'." *Id.*

      Even if the Court accepts Petitioner's tolling calculations and extends the statutory tolling period by 30 days (or even 70 days, *see* Doc. 19 at 47), Petitioner's § 2254 petition is still untimely. The Court previously determined that the current petition was filed 105 days after the AEDPA 1-year limitation period had run, so subtracting 30 or even 70 days does Petitioner no service. "Only state petitions for post-conviction relief filed within the one year allowed by

AEDPA will toll the statute of limitations." *Clark v. Oklahoma*, 468 F.3d 711, 714 (10th Cir.

2006).  The Court sees no error in its prior analysis, and therefore finds Petitioner's argument

asserting statutory tolling unavailing.

2.  Because Neither Actual Innocence Nor Equitable Tolling Apply, the Court Need Not Review Petitioner's Other Claims as They Are Time-Barred

Petitioner also argues that his trial counsel was ineffective, and that the prosecutorial

team committed misconduct during his trial.  *See* Doc. 14 at 5, 7-13.  Specifically, Petitioner

claims that his lawyer had a conflict of interest, abandoned him, failed to investigate, prepare for

trial, conduct pretrial discovery, understand who would be testifying, locate and call potential

witnesses, and cross-examine witnesses properly.  *Id.* at 7-9.  Petitioner also argues that the State

committed prosecutorial misconduct by withholding material evidence, misleading the jury and

making inappropriate statements during opening and closing statements, bolstering witness

credibility, and eliciting false testimony from a key witness.  *Id.* at 10-13.  These claims were

previously raised in the state habeas petition and rejected by the State judge.  Doc. 31-2 at 153-

78.

The Court need not address these claims, as they are time-barred.  *See Slack v. McDaniel*,

529 U.S. 473, 484 (2000) ("Where a plain procedural bar is present and the district court is

correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the

district court erred in dismissing the petition or that the petitioner should be allowed to proceed

further.").  Nevertheless, the Court has reviewed the State trial judge's order dismissing the

habeas petition and concludes there is nothing to suggest that the State judge unreasonably

applied clearly established federal law or otherwise unreasonably determined the facts in light of

the evidence presented.  28 U.S.C. §§ 2254(d)(1), (2).  The State judge examined each of

Petitioner's claims of ineffective assistance of counsel[13] and aptly applied the test set forth in *Strickland v. Washington*. Doc. 31-2 at 155-65. The judge concluded that Petitioner fails to demonstrate both deficient performance and resulting prejudice. *Id.* The Court finds the State judge's analysis thorough and well-reasoned, and supported by clearly established federal law. The Court concludes that Petitioner's ineffective assistance claims are without merit, even if they were not time-barred.

Similarly, the State judge also reviewed Petitioner's prosecutorial misconduct claim. The core of Petitioner's argument is that certain materials were not disclosed to Petitioner prior to trial, and that this alleged failure to disclose constituted a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The State judge carefully examined each of the evidentiary items[14] and concluded that "[t]he prosecution did not commit a Brady violation by failing to disclose exculpatory evidence, and did not commit any acts at trial that deprived Petitioner of a fair trial." Doc. 31-2 at 173. The judge considered whether any of the evidentiary items would have allowed a reasonable jury to conclude that Petitioner was not guilty and concluded Petitioner is unable to prove any prejudice or fundamental unfairness.[15] The Court here is unable to conclude

---

[13]   Petitioner alleged in State habeas that his trial counsel provided ineffective assistance, including that trial counsel: lied to the court in a pretrial hearing; failed to object to a SANE nurse testifying as an expert; operated under a conflict of interest and violated his duty of loyalty; failed to conduct adequate pretrial investigation; failed to object to the SANE nurse's vouching testimony; failed to attend the presentencing report interview; failed to adequately meet with Petitioner prior to trial; employed a defective trial strategy; was unaware that the prosecution would call an expert DNA witness and failed to retain an expert in rebuttal; was late for trial; failed to respond to unproven stalking charges; failed to offer mitigating circumstances at sentencing; and failed to file requested motions. *See* Doc. 31-2 at 155-67.

[14]   These allegedly undisclosed items are: (1) the domestic violence/order of protection case; (2) the DNA crime lab report; (3) the interview with Petitioner's former stepdaughter; (4) the Sexual Assault Nurse Examiner (SANE) report; (5) the interview of the victim; and (6) the interview of former girlfriend. Doc. 31-2 at 168.

[15]   *See* Doc. 31-2 at 167-73 (re domestic violence case: "Petitioner. [...] was aware of its existence and details, therefore [there was]... no harm caused by its lack of disclosure"; re DNA report: "earlier disclosure would not have affected the outcome of the trial"; re SANE report: "the prosecution's failure to provide the report was not material to the case"; re interview of victim: "the balance of Petitioner's trial would not have tipped in any meaningful way if the prosecution had provided the safe house interview sooner"; re interview with Petitioner's girlfriend: "[t]he prosecutor's misstatement may have made the trial imperfect, but did not make it fundamentally unfair"; re

that the State judge misapplied clearly established federal law or unreasonably determined the facts in light of the evidence presented.

3.  <u>The Court Recommends Against Issuing a Certificate of Appealability</u>

Under Rule 11 of the Rules Governing Section 2254 Cases, the Court must issue or deny a Certificate of Appealability (COA) whenever it enters a final order adverse to the § 2254 petitioner.  *See* Habeas Corpus Rule 11(a).  A COA may issue only upon "a substantial showing of the denial of a constitutional right."  *See* 28 U.S.C. § 2253(c)(2); *see also Slack*, 529 U.S. at 484 (stating that to obtain a COA, a petitioner must "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong").  The Court finds that Petitioner has not made such a showing, because Petitioner adequately and fully litigated his claims in the State courts and the period of limitation has lapsed.  The Court recommends against the issuance of a COA.

## CONCLUSION

The Court concludes that Petitioner has sufficiently raised his claims in the State courts, thereby exhausting his remedies prior to filing the instant § 2254 petition.  Furthermore, the Court concludes that the § 2254 petition was filed outside of the 1-year limitation period set by the AEDPA, thereby depriving this Court of jurisdiction.  The Court additionally concludes that the actual-innocence gateway is not available to Petitioner, nor does equitable tolling apply to excuse the untimely filing.  As such, because the AEDPA requires dismissal, the Court recommends that the District Judge dismiss the Petition with prejudice.  Finally, the Court recommends against granting a Certificate of Appealability.

## RECOMMENDATION

---

comments made in opening and closing statements: inaccurate references by prosecutor were made without ill intent and any prejudice incurred was minimal).

For all of the foregoing reasons, the Court finds that Petitioner Salvador Bravo's

*Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus By a Person In State Custody* is

not well-taken and recommends that it be **DENIED** and **DISMISSED WITH PREJUDICE.**

The Court further recommends that a certificate of appealability (COA) be **DENIED**.


_____
JOHN F. ROBBENHAAR
United States Magistrate Judge


---

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---